IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| LEE BURRINGTON<br><br>Plaintiff,<br><br>vs.<br><br>OCWEN LOAN SERVICING, LLC,<br>BANK OF AMERICA, N.A., and U.S.<br>BANK, N.A.,<br><br>Defendants. | CV 15-168-M-DLC-JCL<br><br><br>FINDINGS AND<br>RECOMMENDATION |

Before the Court are Defendants Ocwen Loan Servicing, LLC and U.S.

Bank, N.A.'s Fed. R. Civ. P. 12(b)(6) motion to dismiss, and Defendant Bank of

America, N.A.'s Rule 12(b)(6) motion to dismiss.  For the reasons discussed, the

Court recommends the motions be granted.

## I.     Background

In 2005 Plaintiff Lee Burrington obtained a loan in the amount of $225,000

as evidenced by a promissory note he signed.  The loan and promissory note were

secured by a deed of trust pledging residential real property in Big Fork, Montana.

Defendant Bank of America, N.A. serviced Burrington's loan for a period of

time until November 30, 2013, when Defendant Ocwen Loan Servicing, LLC

("Ocwen") took over the loan servicing tasks.  Defendant U.S. Bank, N.A. is the

1

present owner of Burrington's loan.

In 2009 Burrington began experiencing difficulty in satisfying his monthly payment obligations under the promissory note. He inquired with Bank of America to explore options for repaying his loan. According to Burrington, Bank of America "advised" him to apply for the Home Affordable Modification Program ("HAMP") – a federal program to assist borrowers with existing mortgages. Burrington applied for the modification.

At various times he submitted supplemental information or documents to Bank of America as requested. But he alleges that on multiple occasions throughout 2010 and 2011 Bank of America provided him with conflicting and confusing information about the status of his application and whether a foreclosure sale of his property would proceed. The foreclosure sale was set, cancelled, and reset several times.

On July 15, 2011, Burrington submitted a new application for a loan modification. Again through the remainder of 2011 and 2012 Burrington continued to communicate with Bank of America about his application. But by February 26, 2013, Bank of America confirmed that it intended to pursue foreclosure on the real property, and on July 8, 2013, Bank of America issued a notice of intent to accelerate Burrington's loan.

Bank of America's July 8, 2013 acceleration notice, however, simultaneously invited Burrington to pursue further options to avoid foreclosure and to stay in his home. It again suggested Burrington could again apply for a modification under HAMP. But one month later Bank of America informed Burrington it intended to foreclose on the property.

As of November 30, 2013, Ocwen took over the loan servicing functions from Bank of America. In a letter dated May 19, 2014, Ocwen stated to Burrington the following: "[I]f you are facing financial difficulties, you are not alone. We are here to help you. Since 2010, we've found solutions for more than 100,000 Americans struggling to make mortgage payments." (Doc. 1 at ¶ 68.)

Burrington applied for a loan modification with Ocwen. But according to Burrington, Ocwen provided him with confusing and conflicting information regarding both the status of his loan modification and whether or not it would proceed with a foreclosure sale. On October 22, 2014, Ocwen informed Burrington that his application for a modification under the HAMP program was denied because the investor which owned his loan did not participate in the HAMP program.

Ultimately, however, on November 6, 2014, Ocwen made a loan modification offer to Burrington. But he complains the offer was not helpful. The

offer proposed to increase both the amount of his monthly payments and the total amount of the principal due on the loan. Burrington claims Ocwen's offer was a "take it, or leave it" deal.

Burrington asserts that Bank of America and Ocwen's conduct caused him to suffer damages in the form of lost time, loss of money, loss of peaceable enjoyment of his property, anxiety, and emotional distress. He alleges Bank of America's chronic negligence and delay from 2009 through 2013 caused Burrington to accrue late fees, additional interest, and arrearages which Ocwen later sought to impose against him in its modification offer. Burrington alleges that both Bank of America and Ocwen served as agents of U.S. Bank throughout the time frame of the events alleged in his pleading, and it is liable for Bank of America and Ocwen's torts.

Burrington advances two claims for relief under Montana law: First, he alleges Bank of America and Ocwen engaged in unfair and deceptive practices in violation of the Montana Consumer Protection Act. Second, he alleges Bank of America and Ocwen acted negligently in their dealings with him. Burrington seeks both compensatory and punitive damages.

Burrington's complaint also includes a claim for a declaratory judgment. He requests a declaration establishing that none of the Defendants hold any

beneficial interest in his real property and, therefore, they have no right to foreclose on his property.

## II. Applicable Law

### A. Rule 12(b)(6) Motion to Dismiss Standards

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, a plaintiff's complaint must have sufficient facts "to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). The court accepts all factual allegations in the complaint as true and construes the pleadings in the light most favorable to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Conclusory allegations and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).

### B. Application of Montana Law

In this diversity action, the Court applies the substantive law of Montana, the forum state.  *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

## III.    Discussion

### A.    Bank of America

#### 1.    Montana Consumer Protection Act

Bank of America moves to dismiss Burrington's claims under the Montana Consumer Protection Act asserting they are barred by the two-year statute of limitations applicable to claims under the Act.  Mont. Code Ann. §27-2-211(1)(c).  *Hein v. Sott*, 353 P.3d 494, 498 (Mont. 2015).  The motion is well taken.

The allegations of Burrington's complaint establish that Bank of America serviced his loan and communicated with him regarding his loan modification application from 2009 through November, 2013.  But Burrington did not commence this action until December 17, 2015, beyond the 2-year period of limitations.

Burrington retorts that at least a portion of his claims under the Act survive the statute of limitations.  Specifically, Burrington points to Bank of America's conduct in inviting him to apply for a loan modification under the HAMP program, but not notifying him until October 22, 2014, that the investor in his loan

did not participate in the HAMP program. He argues the empty invitation was unlawful under the Consumer Protection Act because "it is an unfair or deceptive practice when a party 'states that a transaction involves rights, remedies or obligations that it does not involve.'" *Morrow v. Bank of America, N.A.*, 324 P.3d 1167, 1184 (Mont. 2014). And he argues his discovery, and the accrual, of his claim was tolled until October 22, 2014, in accordance with the discovery rule.

The discovery rule is set forth in Montana's limitations statutes as follows:

(3) The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:

(a) the facts constituting the claim are by their nature concealed or self-concealing; or

(b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause.

Mont. Code Ann. § 27-2-102(3). Thus, under the discovery rule the limitations period does not begin to run until the plaintiff discovers, or should have discovered, the facts of the claim. *Draggin' Y Cattle Company, Inc. v. Addink*, 312 P.3d 451, 456 (Mont. 2013). But the discovery rule is triggered only when the facts of the claim are concealed, self-concealing, or when the defendant takes action to prevent the plaintiff from discovering the facts of a claim. *Id.*

Here, Burrington's facts and arguments do not satisfy the conditions of the discovery rule. He does not suggest the fact that the investor in his loan did not participate in HAMP was, by its nature, concealed or self-concealing. He also does not argue that Bank of America affirmatively took action to prevent him from discovering that fact. Although Burrington alleges in his complaint that Bank of America "actively concealed such facts[,]" his pleading does not identify any facts supporting the allegation that Bank of America engaged in actual concealment. (Doc. 1 at ¶ 117.) Thus, the conclusory allegation is insufficient to support his discovery rule theory. At best, Burrington's factual allegations suggest Bank of America did not answer his inquiries, but that conduct does not qualify as active concealment. Absent any showing of concealment – actively preventing discovery – the discovery rule does not apply. *Johnson Farms, Inc. v. Halland*, 291 P.3d 1096, 1106 (Mont. 2012). Consequently, Burrington's Consumer Protection Act claims are all barred by the 2-year statute of limitations.

## 2. <u>Negligence</u>

Bank of America moves to dismiss Burrington's claims of negligence on the basis that the circumstances of this case do not implicate any legally recognized duty that it owed to Burrington. For the reasons discussed, the Court agrees.

A cause of action for negligence requires the plaintiff to prove four essential

elements: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, (3) the breach was the actual and proximate cause of an injury to the plaintiff, and (4) damages resulted." *Peterson v. Eichhorn*, 189 P.3d 615, 620-21 (Mont. 2008).

The existence of an enforceable legal duty is a prerequisite to a negligence claim. *Slack v. Landmark Co.*, 267 P.3d 6, 10 (Mont. 2011). The question of whether a legal duty exists is an issue of law for the court to resolve (*Slack*, 267 P.3d at 10), and the scope or extent of a legal duty "must necessarily be adjudicated upon a case-by-case basis." *Larson-Murphy v. Steiner*, 15 P.3d 1205, 1212 (Mont. 2000).

Under Montana law, the ordinary banking or lending relationship between a bank and its customer is a simple, arms-length, debtor/creditor relationship. *Morrow v. Bank of America, N.A.*, 324 P.3d 1167, 1177 (Mont. 2014) (citation omitted). That common relationship does not impose fiduciary responsibilities upon the lender with respect to its conduct towards a borrower. *Id*. Thus, with respect to an existing loan a lender "has no duty to modify or renegotiate a defaulted loan[]" for the benefit of a borrower. *Id*.

In some complex banking and lending transactions, however, a lender may become a financial advisor to the customer, thereby creating a relationship of trust

and confidence. *Morrow*, 324 P.3d at 1177 (citation omitted). Thus, in certain circumstances where a bank "goes beyond the ordinary role of a lender [...] and actively advises customers in the conduct of their affairs, the bank may owe a fiduciary duty." *Id*. But, to be sure, "[i]f the borrower has not been advised by the bank or has not relied on that advice, no fiduciary relationship exists." *Id*.

Though a fiduciary relationship may arise in certain lender/borrower situations, the fiduciary duty has limits. For example, a fiduciary duty does not exist if the borrow is also being advised by another professional. *Morrow*, 324 P.3d at 1177. Additionally, even where a fiduciary relationship may exist, "a bank is not obligated to avoid foreclosure[, ... and it] may also refuse to modify or renegotiate a loan for 'solid business reasons.'" *Id.* (citations omitted).

In *Morrow*, the borrowers contacted the lender to discuss a modification of their loan. Of significance in that case, the lender responded to the borrowers by "advis[ing] them it would be in their best interests to deliberately miss a payment and default on their loan[, and the borrowers...] relied on this advice when they intentionally defaulted on their mortgage [to their detriment] hoping to qualify for a modification." *Morrow*, 324 P.3d at 1178. The borrowers "defaulted only at [the lender's] direction." *Id*. 324 P.3d at 1181. The lender also advised the borrowers to pay a reduced monthly loan payment amount. Under those

circumstances, the Court concluded that the lender's advice was "not the type of advice 'common in the usual arms-length debtor/creditor relationship.'" *Id*. 324 P.3d at 1178. Once the lender provided its financial advice it created a fiduciary relationship with the borrowers and, consequently, after the borrowers' loan was in default "they had little choice but to continue placing their trust in the bank." *Id*.

The Court in *Morrow* further acknowledged that certain facts, "if proven, could support a fiduciary duty where 'Defendant went beyond its conventional role as a loan servicer by soliciting Plaintiffs to apply for a loan modification and by engaging with them for several months[.]'" *Morrow*, 324 P.3d at 1178 (citation omitted). The Court emphasized that where the fiduciary duty arises it imposes upon the lender a "duty to manage the [loan] modification process in a manner that would not cause the [borrowers] to suffer loss or injury by reason of its negligence." *Id*. Thus, it is only a lender's solicitation in a manner that causes damages to the borrower which gives rise to liability as a fiduciary. *Id*.

The circumstances of the *Morrow* case involved a lender soliciting a loan modification application in a harmful manner. In reliance upon the lender's advice and instruction, the borrowers made reduced monthly loan payments for fourteen months. That reliance caused harm to the borrowers in that, as a result, they went

into default, and the amount of their default or deficient loan payments grew significantly to their detriment. *Morrow*, 324 P.3d at 1179, 1184-85.

The Court in *Morrow* looked to federal regulatory guidelines under the HAMP program to assess the borrowers' claim of negligence. The Court first recognized that HAMP does not provide a private right of action, and it does not create a duty of care. But the Court considered that the regulatory guidelines under HAMP "may provide evidence of a breach of *an already existing duty.*" *Morrow*, 324 P.3d at 1178 (citation omitted and emphasis added). Under HAMP lenders must, inter alia, provide information to assist a borrower in understanding both the loan modification terms and the modification process, engage in communications which minimize confusion and reduce risks in the transaction, provide timely and appropriate responses and resolutions to inquiries and complaints, determine the borrower's eligibility for a modification, and promptly communicate a borrower's ineligibility to the borrower. *Morrow*, 324 P.3d at 1179. But again, the Court noted it would only look to these guidelines "to further define the standards to which [the lender] had to conform its conduct, *if the evidence establishes the basis for imposition of such a duty.*" *Id*. (emphasis added). Consequently, the circumstances of a case must first support the existence of a fiduciary relationship between the lender and borrower before the HAMP

regulatory guidelines are implicated.

Here, Burrington argues his factual allegations plausibly state a claim of negligence against Bank of America.  He focuses primarily on Bank of America's conduct from November of 2009 through July of 2013 "advising" him to apply for a HAMP modification which he contends imposed a fiduciary duty on Bank of America.  (Doc. 35 at 14-15 of 34.)  Burrington contends Bank of America violated that duty by waiting until October 22, 2014, to inform him that the owner of his loan did not participate in the HAMP program.

Although Burrington alleges Bank of America "advised" him to apply for a HAMP modification, it is significant that he does not allege that it gave him any further advice or instruction, to his detriment, specific to the conduct of his financial affairs.  He does not allege Bank of America advised or instructed him to default on his loan, to make reduced monthly loan payments, or to engage in any act that would be financially detrimental to him.  At most, he alleges Bank of America advised him to apply for a loan modification under HAMP, and it gave him inconsistent or conflicting information as to the status of his application and the status of any scheduled foreclosure sale, but without first giving him adverse advice as to the conduct of his affairs.  Although Burrington's default and arrearages may have grown similar to the facts in *Morrow*, his allegations suggest

only that the growth of his default was a result of his own financial difficulties, not a result of any advice given by Bank of America. In short, Burrington does not allege Bank of America gave him any financial advice or instruction on which he reasonably relied to his detriment. Absent advice as to the conduct of affairs, or reasonable reliance to the borrower's detriment, no fiduciary relationship or duty exists. *Morrow*, 324 P.3d at 1177.

Based on the foregoing, the Court concludes the circumstances of this case do not support the existence of a legal duty to be imposed upon Bank of America's conduct. Burrington's claims of negligence should be dismissed.

### 3. Punitive Damages

Bank of America moves to dismiss Burrington's claim for punitive damages on the ground that all of his underlying claims of liability for actual damages are not viable and, therefore, recovery of punitive damages is not available to him. Absent a recovery of actual damages there exists no right of action for punitive damages. *Stipe v. First Interstate Bank-Polson*, 188 P.3d 1063, 1068 (Mont. 2008). Because the Court recommends dismissal of Burrington's claims, Bank of America's motion should also be granted as to Burrington's claim for punitive damages.

### 4. Declaratory Judgment

In seeking dismissal of Burrington's claim for declaratory relief, Bank of America points out that Burrington's allegations establish that Ocwen took over the loan servicing duties from Bank of America as of November 30, 2013. And Burrington does not allege Bank of America continues to assert any right or interest in either the loan, the loan servicing, or the property securing the loan. Burrington concedes his claim for declaratory relief should be dismissed because Bank of America disclaims any interest in his property.

### B.   Ocwen and U.S. Bank

Ocwen and U.S. Bank jointly move to dismiss Burrington's claims for negligence, violations of the Montana Consumer Protection Act, and for punitive damages. But their motion does not address Burrington's claim for a declaratory judgment. For the reasons discussed, the Court concludes the motion should be granted.

#### 1.   Negligence

Ocwen and U.S. Bank also move to dismiss Burrington's claim of negligence on the ground they owed no fiduciary duty to Burrington. And alternatively, they argue that Burrington's allegations do not identify any damages he sustained as a result of any act or omission committed by either Ocwen or U.S. Bank. Both motions are well taken.

As discussed with respect to the *Morrow* case, a lender otherwise has no duty to modify an existing loan, and a lender would subject itself to a fiduciary duty only if it actively advises its customers in the conduct of their affairs in such a manner that the advice causes a borrower to suffer a loss or injury. But absent the requisite type of advice, or absent a borrower's reliance on such advice to the borrower's detriment, no fiduciary duty arises. *Morrow*, 324 P.3d at 1177.

Ocwen and U.S. Bank assert Burrington's allegations do not identify any advice that they provided to him which triggered a duty under negligence law as discussed in *Morrow*. They did not advise Burrington to take any action to his financial detriment, they did not advise him to miss or skip a payment on his loan, they did not advise him to make reduced monthly payments or to get behind on his loan payments and to go into default on his loan. There are no allegations in Burrington's complaint suggesting that either Ocwen or U.S. Bank provided Burrington with advice in any capacity at all.

Burrington relies on various allegations in his complaint which he asserts qualify as the type of detrimental financial advice that triggers a fiduciary duty as found in *Morrow*. Burrington contends Ocwen provided the requisite "advice" in a letter it sent to him dated May 19, 2014, stating that "if you are facing financial difficulties, you are not alone. We are here to help you." (Doc. 1 at ¶ 68.)

Burrington argues this "offer of assistance" triggered a fiduciary duty of care which Ocwen breached. Contrary to Burrington's argument, the identified offer of assistance does not qualify as advice given by Ocwen to guide Burrington in the conduct of his affairs.

Burrington also complains that Ocwen improperly engaged him in loan modification discussions while at the same time moved his home into foreclosure – so called "dual tracking". But again, the modification discussions do not qualify as "advice" within the contemplation of *Morrow*. Granted, Ocwen was assessing whether Burrington qualified for a loan modification, but in doing so Ocwen was "not obligated to avoid foreclosure." *Morrow*, 324 P.3d at 1177.

Burrington emphasizes that after Ocwen made its offer of assistance, it provided him with confusing, misleading and conflicting information about the status of his application – circumstances discussed in *Morrow*, 324 P.3d at 1179, which supported the Morrows' claim of liability. But a lender's provision of confusing and conflicting information, by itself, does not give rise to liability. The court in *Morrow* made clear that the relevant standards under the HAMP regulations prohibiting a lender from providing confusing information could "define the standards" of care only if the evidence otherwise "establishes the basis for imposition of [...] a duty[]" in the first place. *Morrow*, 324 P.3d at 1179. The

standards under HAMP would only "provide evidence of a breach of an already existing duty[]" – they do not give rise to a duty. *Id*. at 1178.

Burrington also relies upon further statements in *Morrow* indicating that a lender's provision of misleading or conflicting information to a borrower suggests "a lack of reasonable care in communicating the information." (Doc. 25 at 6 (citing *Morrow*, 324 P.3d at 1181).) The referenced statement, however, was made in connection with the court's discussion of an independent claim of negligent misrepresentation which is separate and "distinct from" a claim of negligence. *Morrow*, 324 P.3d at 1180-81. But as accurately pointed out by the Defendants, Burrington has not expressly pled a claim of negligent misrepresentation.

Burrington next emphasizes that the court in *Morrow* declared that "once [the borrowers'] loan was in default they had little choice but to continue placing their trust in the bank." *Morrow*, 324 P.3d at 1178. Burrington suggests he had no choice but to trust Ocwen and, therefore, it is subject to liability. But Burrington fails to recognize that the quoted statement in *Morrow* applied only after the court had already found that the bank expressly advised the borrowers to miss a payment and go into default on the loan, thereby creating a relationship of trust and confidence, and subjecting the bank to a fiduciary duty. *Id*. Burrington

does not allege Ocwen expressly advised him to default on the loan. Thus, the quoted statement from *Morrow* does not apply where a borrower defaults on a loan based on his or her own failure to comply with the terms of the loan. Burrington's own failure to make his loan payments does not constitute conduct committed by Ocwen which placed him in a position of having to trust Ocwen.

Finally, Burrington suggests Ocwen violated the standard of care imposed by the HAMP regulations when it "solicited" him to seek a HAMP loan modification even thought the investor on his loan did not participate in the HAMP program. (Doc. 25 at 6-7 (citing *Morrow*, 324 P.3d at 1178-79).) But again, the HAMP regulations are relevant only after first demonstrating that the lender engaged in conduct – by providing the requisite type of adverse advice – which triggered a fiduciary duty. Neither the HAMP program, nor its regulations, give rise to a cause of action. *Morrow*, 324 P.3d at 1178.

Based on the foregoing, the Court concludes the circumstances alleged in Burrington's complaint do not give rise to a legal duty imposed upon Ocwen or U.S. Bank. Absent the existence of a legal duty, Burrington's negligence claims fail.

## 2. <u>Montana Consumer Protection Act</u>

The Montana Consumer Protection Act applies to lenders and prohibits

"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  Mont. Code Ann. § 30-14-103.  *Morrow*, 324 P.3d at 1184.  An act or practice is deemed "unfair if it 'offends established public policy and ... is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Id*. (citation omitted).  "A consumer who suffers any ascertainable loss of money or property" may bring an action under the Act.  Mont. Code Ann. § 30-14-133(1).

Ocwen and U.S. Bank assert Burrington's allegations are insufficient to state a claim because they did not advise Burrington to take any action to his financial detriment.  They did not advise him to miss a loan payment, or to go into default on his loan.

In response, Burrington argues Ocwen's written communication to him inaccurately and unfairly informed him it was there to "help" borrowers who are facing financial difficulties.  (Doc. 1 at ¶¶ 68, 85.)  He complains that when he took Ocwen up on its offer of help it provided him with conflicting and confusing information which caused him to lose time and money, and to experience stress.  And, although Ocwen ultimately offered him a loan modification, Burrington complains the offer was not actually helpful to him.  The offer increased both the total principal of the loan and the monthly payment amount.  The increase was

caused by arrearages Burrington accumulated and owed on his loan. Burrington blames Bank of America for its conduct from 2009 through the end of November, 2013, which allegedly caused the loan principal and payments to increase.

Burrington argues all of the foregoing events – delays, the provision of inaccurate information, and the growth of his default and arrearages – constitute unfair or deceptive practices committed by Ocwen as found in *Morrow*, 324 P.3d at 1184-85. But, significantly, the court in *Morrow* only found similar conduct by the lender in that case to be unfair and deceptive because the lender had previously advised and instructed the borrowers to miss a loan payment and default on the loan, and to make reduced monthly payments, thereby causing the borrowers' default to grow. In *Morrow* it was the lender's initial adverse advice and instruction which rendered its subsequent conduct unfair or deceptive to the borrowers' detriment. *Id*.

Here, Burrington's allegations do not include any facts suggesting Ocwen ever advised him to take any action to his detriment. Ocwen did not instruct him to default on his loan, or to get behind on his payments. Thus, any delays or conflicting information provided by Ocwen, standing alone, do not constitute unfair or deceptive acts which caused him any ascertainable loss. Therefore, the Court concludes Ocwen and U.S. Bank's motion should be granted in this respect.

### 3. Punitive Damages

Ocwen and U.S. Bank move to dismiss Burrington's claim for punitive damages on the ground that he has no remaining viable claim for actual damages. Burrington did not respond to this aspect of Ocwen and U.S. Bank's motion.

Ocwen and U.S. Bank accurately point out that a recovery of actual damages on a viable underlying claim of liability is a predicate event for the recovery of punitive damages. *Stipe v. First Interstate Bank-Polson*, 188 P.3d 1063, 1068 (Mont. 2008). Therefore, because Burrington's allegations fail to state a cognizable claim for relief, his claim for punitive damages is also subject to dismissal.

## IV. Conclusion

Based on the foregoing, IT IS HEREBY RECOMMENDED that Bank of America's motion to dismiss be GRANTED, and all of Burrington's claims advanced against it should be DISMISSED.

IT IS FURTHER RECOMMENDED that Ocwen and U.S. Bank's motion to dismiss be GRANTED, and Burrington's claims for negligence, violations of the Montana Consumer Protection Act, and punitive damages be DISMISSED.

DATED this 4th day of May, 2016.

Jeremiah C. Lynch
United States Magistrate Judge